(3 P.3d 558)

No. 82,485

VALDA L. FLETCHER, *Plaintiff/Garnishor/Appellee,* v. JED ANDERSON, *Defendant,* v. FARM BUREAU MUTUAL INSURANCE COMPANY, INC., *Garnishee/Appellant.*

Opinion filed March 31, 2000.

*Paul Hasty, Jr.*, and *Arlen L. Tanner*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for the appellant.

*Gerald W. Scott*, of Gerald W. Scott, P.A., of Wichita, for the appellee.

Before ELLIOTT, P.J., LEWIS, J., and PADDOCK, S.J.

LEWIS, J.: This is a garnishment action in which Farm Bureau Mutual Insurance Company, Inc. (Farm Bureau) appeals from the trial court's denial of its cross-motion for summary judgment and the trial court's entry of judgment in favor of plaintiff Valda L. Fletcher, in the amount of $50,000, along with attorney fees in an amount to be determined.

The parties have submitted lengthy briefs in which they raise a plethora of complex and highly disputed issues. In order to understand those issues, we will undertake a rather exhaustive examination of the facts not only in the garnishment action but also in the underlying personal injury action.

The genesis of this garnishment action was a tragic automobile accident that occurred in 1987. In that accident, plaintiff's son, along with Tony Anderson, the driver of the vehicle in which he was riding, and two other passengers were all killed.

Tony and Jed Anderson were half-brothers and both were adults at the time of the accident. Tony lived with his grandparents, Zola and Willard Thornbrugh. Tony's natural father is John Thornbrugh.

Apparently, prior to this accident, Tony had a rather poor driving record and, at the time of the accident, had only a restricted driver's license. Tony's driver's license allowed him to drive only to and from work, for a medical emergency, and to "AA-type" meetings.

At the time of the accident, Tony was driving a 1984 Camaro. This automobile was titled in the name of John Thornbrugh but

was purchased with Tony's money. According to his father, Tony inherited some money and wanted to buy a car; however, Tony had at least two DUI's and a restricted driver's license. Ultimately, it was agreed that Tony would purchase a 1984 Camaro but that it would be titled under his father's name. In addition, John would purchase insurance on the automobile, and Tony would not drive that automobile until he got his driver's license back. Tony and John agreed that when Tony got his driver's license back, John would place title to the vehicle in Tony's name.

John insured the Camaro with Hawkeye Security Insurance Company (Hawkeye). The vehicle itself was left at the home of Tony's grandparents, with whom he lived.

A day before the fatal accident, Jed and some friends went to the home where Tony lived. Tony handed Jed the keys to his car, and Tony, Jed, and their friends left the home of Tony's grandparents in the Camaro. Jed was driving the vehicle at Tony's request. According to Jed, after the parties had traveled for 20 minutes or so, they stopped at a liquor store in Perry to purchase some beer. At this point, Tony demanded the keys to his car and told Jed that he would drive. Jed knew that Tony was not allowed to drive, and they argued about the issue. Tony insisted that it was his car and that he would drive; he demanded the keys, Jed gave him the keys, and Tony drove the vehicle from that point on.

Jed and Tony took the Camaro from the home of Tony's grandparents on January 24, 1987. At some time during that date, Jed separated from Tony and was not in the vehicle, nor was he anywhere near the site of the accident which occurred on the next day. In fact, the facts indicate the day of the fatal accident, Tony and a female companion drove the vehicle back to Tony's grandparents' home where he had a confrontation with his grandmother over driving the vehicle. The grandmother attempted to dissuade Tony from driving the vehicle, but he informed her it was his car and he would drive it if he wanted to.

Plaintiff's son was killed in the accident on January 25, 1987. In April 1990, plaintiff sued Jed and State Farm Mutual Insurance Company (State Farm), seeking damages for the wrongful death of her son. The sole basis for the liability of Jed was that he neg-

ligently entrusted the automobile to Tony. State Farm was sued on the basis that Jed was an uninsured motorist under plaintiff's State Farm policy. Eventually, it was determined that an uninsured motorist claim did not arise out of the accident, and State Farm ceased to be an active party in the lawsuit.

The action against Jed was brought to a trial before a jury. After hearing all the facts, the jury determined plaintiff's damages were $3,504.18 and found Tony to be 90% at fault and Jed to be 10% at fault. The results of the jury verdict were a judgment against Jed in the amount of $350.42.

Jed was the son of Arlene Coon and resided in her household. Arlene and her husband, Gary, were the named insureds on an automobile insurance policy issued by Farm Bureau. Plaintiff and others claimed that Jed was an insured person under his mother's Farm Bureau policy, which had limits of $100,000 per person and $300,000 per accident. Farm Bureau did not believe it covered the liability asserted against Jed by plaintiff. Farm Bureau offered to provide a defense to Jed under a written reservation of rights agreement. Jed accepted this offer, and Farm Bureau and Jed entered into a written reservation of rights agreement on January 5, 1990. The reservation of rights agreement stated, among other things:

"Farm Bureau has notified Jed Anderson that Farm Bureau maintains that the Farm Bureau policy provides no coverage to Jed Anderson for the claims made against him by Valda Fletcher for the reasons stated above and Farm Bureau reserves its rights to maintain that position of lack of coverage and Jed Anderson reserves his rights to maintain his claims that the Farm Bureau policy does provide coverage to him, and with the parties hereto each reserving those rights, the parties agree to the defense of Jed Anderson by Farm Bureau with those reservations of rights."

The agreement further required Jed to cooperate with Farm Bureau in the defense to the action. The agreement made it clear that neither the actions of Farm Bureau in providing the defense nor the actions of Jed in cooperating with the defense would be construed or constitute "a waiver or an estoppel of the rights of either."

Attorney George F. Farrell, Jr., was hired by Farm Bureau to represent Jed. The facts indicate that Farrell had originally been

retained by Patrons Mutual Insurance to defend Jed in the wrongful death action. At some point, it was determined that Patrons Mutual provided no coverage for Jed or plaintiff had settled with Patrons Mutual. At this point, Farrell was retained by Farm Bureau to defend Jed. Farrell states in an affidavit filed in this case that "[a]lthough Patrons Mutual and Farm Bureau paid my fee, I represented Jed Anderson in the case. I did not represent Patrons Mutual and I did not represent Farm Bureau."

It is noted that Hawkeye, which insured the Camaro, also denied coverage and is not involved in this garnishment. As near as we can determine, plaintiff filed an action against Hawkeye, which was decided in favor of Hawkeye. In any event, Hawkeye has not been garnisheed, although Farm Bureau continues to argue that Hawkeye did, in fact, have coverage of the vehicle involved in the accident.

After the jury's verdict was rendered, the trial court, on the motion of plaintiff, granted a new trial on the issue of damages only. This left intact and binding the jury's determination that Jed was only responsible for 10% of whatever damages a new jury might assess.

At some point, a proposal was made to Jed that he consent to a judgment against him in the amount of $50,000. Jed agreed to this settlement offer, which provided that plaintiff would not seek recovery against Jed but would seek satisfaction only from potential insurance coverage.

On May 23, 1991, a consent judgment was entered against Jed in the amount of $50,000.

Farm Bureau was not a party to the wrongful death action and was not represented by counsel in that action, although this fact is disputed by plaintiff.

On February 21, 1991, Farm Bureau, through its attorney Paul Hasty, Jr., advised Farrell that it would not agree to any consent judgment entered against Jed Anderson. The letter stated, among other things, the following:

"I anticipate that if Mr. Anderson enters an agreement to agree to judgment being entered against him, Farm Bureau will deny coverage. Mr. Anderson has claimed coverage under the Farm Bureau policy and has requested that Farm

Bureau assume control of the defense. Farm Bureau has done that, while reserving its rights with regard to coverage. If Mr. Anderson is still claiming coverage under the Farm Bureau policy, he has no right to agree to the entry of judgment unless he is going to pay it himself or unless he is going to limit any attempt to execute or collect on the judgment to the Hawkeye coverage."

On May 20, 1991, a letter was faxed to Farrell by Farm Bureau, again stating that Farm Bureau would not agree to any consent judgment. The letter advised Farrell that "[i]f he enters the agreement, he will be breaching the cooperation clause of his insurance policy."

On May 21, 1991, Farm Bureau sent a telecopy to Farrell, in which it said, among other things:

"Obviously, you represent Mr. Anderson; you do not represent Farm Bureau. If Mr. Anderson has made the decision to enter into an agreement with plaintiff over the objection and in the face of Farm Bureau's opposition to doing that, he has made that decision. I think it means he has no insurance coverage."

On May 24, 1991, a similar letter was written to Jed in care of his personal attorney, Ted Hollembeak.

On May 24, 1991, the consent judgment in favor of plaintiff and against Jed was entered in the amount of $50,000, and a demand was made on Farm Bureau to pay that judgment. On May 29, 1991, Farm Bureau, in writing, declined to pay the judgment.

As noted, the judgment was entered in 1991 and the parties continue to litigate the matter in 2000. We have no idea what time constraints these parties were operating under, but it was not until May 1996 that Farm Bureau was served with the orders that instituted this garnishment action. We have no idea why a period of 5 years was allowed to pass.

The procedural history of this action is nearly as complex as the facts related above.

Although somewhat tedious, it is important, as will be seen, to note the dates certain motions for summary judgment and/or to dismiss were filed and decided. Our review of the record reveals that the following motions for summary judgment and/or to dismiss were filed:

(1) July 8, 1996, Farm Bureau filed a motion to dismiss based on the statute of limitations.

(2) February 6, 1997, Farm Bureau filed a motion for summary judgment, arguing that Jed has failed to comply with policy requirements and avoided any coverage.

(3) March 6, 1997, Farm Bureau filed a motion for summary judgment, arguing its policy only provided excess coverage.

(4) August 13, 1997, plaintiff filed a motion for summary judgment on the issue of coverage.

(5) September 5, 1997, Farm Bureau apparently filed a motion in opposition to plaintiff's motion for summary judgment and a cross-motion for summary judgment. (The cross-motion itself is not included in the record on appeal.)

These motions were decided at various times as follows:

(1) March 13, 1997, the motion for summary judgment filed by Farm Bureau on February 6, 1997, was denied. The only evidence of this is a note on the docket minute sheet, and the trial court gives no explanation or reason for its denial of the motion.

(2) May 19, 1997, the trial court denied Farm Bureau's motion to dismiss filed July 8, 1996. The trial court held that Farm Bureau is estopped to raise a statute of limitations defense.

(3) September 11, 1997, the trial court granted plaintiff's motion for summary judgment on coverage filed August 13, 1997. In doing so, the trial court found coverage existed and no policy exclusion applied to coverage.

(4) October 22, 1998, the trial court denied Farm Bureau's cross-motion for summary judgment, which apparently was filed on September 5, 1997. This journal entry awarded judgment to plaintiff in the amount of $50,000 with costs and attorney fees to be determined later.

(5) November 6, 1998, Farm Bureau filed its notice of appeal.

Our attempt to wade through the procedural complexities of a garnishment action was fraught with some difficulty. In some instances, the trial court gave little, if any, reason for its actions. In others, the time delay was inexplicable. For instance, nearly 1 year passed between the order granting plaintiff's motion for summary judgment and the order denying Farm Bureau's cross-motion for summary judgment. However, it is not until the order of October

22, 1998, that judgment was finally rendered against Farm Bureau, and that appears to be one of the few "final" orders in the record.

We now turn to the issues on appeal.

## JURISDICTION

Plaintiff argues that Farm Bureau is limited on appeal to those issues raised and decided in the journal entry of October 22, 1998. We disagree.

Farm Bureau's notice of appeal appeals from "the orders, judgments, and decrees of the District Court finding in favor of the plaintiff and against garnishee, *including but not limited to* the Journal Entry of Judgment dated October 22, 1998, and the Court's Orders overruling garnishee's Motion for Summary Judgment and/or Dismissal." (Emphasis added.)

In examining the notice of appeal, we see little mystery in it. Farm Bureau appeals from "the orders, judgments, and decrees" of the trial court that were in favor of plaintiff and against Farm Bureau. The issues appealed "include" but are not limited to those issues touched on in the journal entry of October 22, 1998. Anyone reasonably conversant with the English language should have understood that Farm Bureau was appealing from every adverse order, judgment, or decree entered against it and in favor of plaintiff. Plaintiff, in all candor, does not claim that she was surprised or placed at a disadvantage by the issues briefed by Farm Bureau but insists on attempting to limit the issue on appeal on a jurisdictional basis.

The most recent decision cited by plaintiff in support of her argument is found in volume 216 of the Kansas Reports. We note that most of the decisions cited by plaintiff in her brief are found in volumes 157, 182, 183, and 191, of the Kansas Reports. The decisions relied on by plaintiff to support her jurisdictional argument no longer represent the law of this state.

The appellate courts of this state have rejected the strict construction and hypertechnical approach taken in the decisions cited by plaintiff.

In *Hess v. St. Francis Regional Med. Center*, 254 Kan. 715, Syl. ¶¶ 1-2, 869 P.2d 598 (1994), the court held:

"It is a fundamental proposition of Kansas appellate procedure that an appellate court only obtains jurisdiction over the rulings identified in the notice for appeal."

"K.S.A. 60-102 provides for liberal construction to secure the just, speedy, and inexpensive determination of every action or proceeding. *The code of civil procedure was not rewritten to make more technical and burdensome the requirements of the notice of appeal as construed by the court in its previous decisions.*" (Emphasis added.)

In *Hess*, the appellant had not specifically designated any specific trial court ruling as being appealed from. The court concluded that despite this fact, the notice of appeal was sufficient to vest in it jurisdiction over the issues briefed and said: "Using a liberal construction to secure the just, speedy, and inexpensive determination of every action or proceeding required by the code of civil procedure, we find that the notice of appeal was sufficient to include the issues stated in the appellant's brief." 254 Kan. at 720.

In *Key v. Hein, Ebert & Weir, Chtd.*, 265 Kan. 124, 129, 960 P.2d 746 (1998), the court continued to follow the path laid down in *Hess*:

"[T]his court has rejected entreaties to make the requirements of the notice of appeal technical or burdensome. [Citation omitted.] Its approach has been to use a broad or 'liberal construction to secure the just, speedy, and inexpensive determination of every action or proceeding' required by the code of civil procedure."

The decision in *Key* is controlling in this case. It is controlling not only intellectually but factually. In *Key*, the notice of appeal appealed from a court order entered December 19, 1996, and·" 'from each and every order entered contrary to plaintiff.' " 265 Kan. at 128. The appellee in *Key* sought to limit the appeal only to the issues touched on in the order of December 19, 1996. The court construed the notice of appeal liberally and held that it covered earlier court orders not specifically designated. It noted that the catch-all language "obviously embraces the entry of summary judgment." 265 Kan. at 130.

We construe the notice of appeal in this case in harmony with the decisions in *Hess* and *Key*. We hold the notice of appeal in this case was sufficient to appeal every order or judgment entered by the court contrary to Farm Bureau. That would include the various orders for summary judgment listed above.

## IS FARM BUREAU BOUND BY THE CONSENT JUDGMENT?

This issue is probably inappropriately titled. The real question, in our opinion, is whether the consent judgment entered into by Jed was reasonable. The other side of that same coin is the question of whether Farm Bureau was unreasonable or negligent, or whether it acted in bad faith when it refused to agree to or pay the consent judgment. In the final analysis, however, stripped of all the legal verbiage, we must determine if Farm Bureau was bound by Jed's agreement to consent to a $50,000 judgment against him— an agreement which, we note, offered no risk to Jed and essentially loosed the hounds on Farm Bureau, which was the only designated target left for payment.

The Kansas Supreme Court has touched on when an insurer may be held liable in a garnishment action for a judgment to which it did not consent. It did so most recently in an exhaustive manner in *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997). Other key Kansas cases in this area are *Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79 (1990); *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969).

This is a case in which Farm Bureau denied coverage and provided a full and effective defense to Jed under a reservation of rights. Indeed, the defense supplied was so effective that after a jury trial, plaintiff received only a $350 judgment against Jed.

Despite the effectiveness of the defense, there is no serious question that Farm Bureau implicitly denied it had coverage for a number of reasons. Despite denying coverage, Farm Bureau argues it is not bound by the consent judgment. For the reasons set out later, we agree with Farm Bureau.

To begin with, the findings of the trial court in its order of September 11, 1997, in which it granted plaintiff summary judgment, and in its order of October 22, 1998, in which it denied Farm Bureau's cross-motion for summary judgment, are insufficient to support the judgment entered against Farm Bureau.

In *Associated Wholesale Grocers*, the court was very clear in setting out the circumstances under which an insurance company

might be held responsible for a consent judgment to which it was not a party and to which it did not agree:

"An insured does not lose rights against the insurer by entering into a settlement after the insurer's *bad faith denial of coverage* and refusal of *a reasonable settlement offer* within policy limits. NPIC's denial of coverage was wrongful, *and if the denial was in bad faith* and *the policy limits settlement offer was rejected either in bad faith or negligently,* then lack of NPIC's consent to the Americold settlement agreement does not preclude its enforcement against NPIC, *if the amount is reasonable.*" (Emphasis added.) 261 Kan. at 833.

Farm Bureau stands in roughly the same position as NPIC, an insurer in *Associated Wholesale Grocers.* It can only be held liable if it was guilty of a *bad faith denial of coverage* and if it refused a *reasonable settlement offer.* Although it denied coverage, that denial of coverage can only subject it to liability if the denial was in bad faith and the policy limit settlement offer was rejected in bad faith or negligently. The trial court in this case held that Farm Bureau "had violated its contract by denying coverage, and Jed Anderson was free to negotiate and enter into an agreed judgment."

As near as we can discern, there are no other findings by the trial court concerning Farm Bureau's denial of coverage. There is no specific finding that the denial of coverage was wrongful, and there is no finding of any kind that it was in bad faith. There is no finding that Farm Bureau ever rejected any settlement offer and certainly there is no finding that it did so in bad faith or negligently.

As we read and understand the law of this state as set out by Justice Six in *Associated Wholesale Grocers,* the entry of summary judgment against Farm Bureau should be reversed because the trial court's findings are insufficient to support a judgment against Farm Bureau under the circumstances shown. There is no finding that the settlement agreement entered into by Jed was reasonable, and there are no findings that Farm Bureau acted in bad faith or negligently in any way.

However, we conclude that not only did the trial court err in awarding summary judgment to plaintiff, and we reverse that award, it also erred in not granting summary judgment in favor of Farm Bureau. We reach that decision based upon our conclusion that Farm Bureau was not bound by the consent agreement which

we consider to be unreasonable as a matter of law. We further conclude that Farm Bureau was not unreasonable and did not act in bad faith in refusing to pay the consent judgment. We cannot imagine any circumstances where a known party to an action should be held responsible for a $50,000 consent judgment under the facts shown by this record.

Farm Bureau argues it advised Jed that the consent judgment would void any coverage he might have and that it would not pay for such a judgment. This argument is totally supported by the record on appeal. We have, earlier in our opinion, detailed the letters from Farm Bureau to Jed and his attorney advising time and again that Farm Bureau would not agree or pay for any "consent judgment" that Jed might enter into. The first letter of Farm Bureau was sent 3 months prior to the entry of judgment, and the others were sent either prior to the entry of that judgment or prior to Farm Bureau's being advised of the entry of the consent judgment. The record overwhelmingly supports Farm Bureau's argument that it did not agree to or participate in the entry of any consent judgment in favor of plaintiff and against Jed.

We conclude the consent judgment was so unreasonable under the facts shown that it would be a miscarriage of justice to hold that Farm Bureau was bound by it. The parties tried this case to a jury, which found Tony to be 90% at fault and Jed only 10% at fault. The jury awarded plaintiff judgment against Jed in the amount of $350. It is true that a new trial was granted, but only on the issue of damages. In order to justify a reasonable consent judgment of $50,000, one must somehow assume that the next jury, on the same facts, would award plaintiff $500,000 instead of $3,504. We see no basis for such an assumption, and we cannot conclude it was reasonable for Jed to subject Farm Bureau to such a judgment. In *Associated Wholesale Grocers*, Justice Six said: "We are apprehensive, under these facts, to affirm summary judgment bad faith liability for damages above policy limits. NPIC made an oral offer to defend under a reservation of rights after National Union exhausted its limits." 261 Kan. at 821. In this case, Farm Bureau made a written offer to defend under a reservation of rights and carried through with that defense quite successfully. We are

more than apprehensive about this judgment, and under these facts we reverse it outright.

Under the facts, plaintiff offered Jed a no risk way to let her take judgment. She agreed she would not pursue Jed, and the easy way out was for Jed to place the risk on Farm Bureau. Farm Bureau was not a party to this decision and registered its strong objection but to no avail.

"The reasonableness of a policy limits settlement offer must be viewed through the insurer's eyes at the time the offer was rejected. The insurer must evaluate the settlement offer without regard to policy limits." *Associated Wholesale Grocers*, 261 Kan. 806, Syl. ¶ 9. In our judgment, the settlement agreement, as viewed through the eyes of Farm Bureau at the time the offer was rejected, was unreasonable. We conclude that Farm Bureau was not at fault in viewing the agreement in this manner.

Plaintiff argues that Farm Bureau did not raise the issue of reasonableness of the settlement to the trial court and, therefore, cannot raise it on appeal. We disagree. The issue was raised in Farm Bureau's cross-motion for summary judgment, which was denied on October 22, 1998.

Plaintiff also argues Farm Bureau is bound by the consent judgment because it was negotiated by the attorney Farm Bureau hired to represent Jed and, thus, the argument is that this attorney also represented Farm Bureau. This argument is totally without merit.

In *Bell v. Tilton*, 234 Kan. 461, 465-66, 674 P.2d 468 (1983), the Supreme Court said:

"The mere fact an insurance company retains an attorney to represent an insured against a lawsuit does not mean the attorney is also the insurance company's attorney capable of binding the insurance company. In *Hensley v. Hartford Accident & Indemnity Company*, 451 S.W.2d 415 (Ky. 1970), plaintiff contended because a company lawyer had participated in the insured's defense at the initial trial the insurance company had waived its right to disclaim liability under the policy. In rejecting this contention, the Kentucky Court of Appeals (then Kentucky's highest court), observed:

" 'The plaintiff cites a number of authorities which consider the question of waiver and estoppel asserted by the insured against his insurance company. That problem is not involved here.

" 'The insured had no claim and has made no claim against the company. He was timely notified of the probable lack of coverage and the company reserved all of its rights to disclaim liability for any judgment against him. We know of no theory on which the plaintiff could have acquired any rights against the company. *Surely an insurance company lawyer can appear in the courtroom defending an accident claim against an insured without committing the company to pay the judgment.* The representation of the insured by the company lawyer in the present case may have given the plaintiff cause for hope that there was insurance coverage. Such hope does not create a cause of action.

" 'There was no waiver or estoppel.' 451 S.W.2d at 416. (Emphasis supplied.)"

The court in *Bell* also relied on *Earl v. Thompson*, 128 Ill. App. 2d 32, 262 N.E.2d 320 (1970). We agree that the Illinois action is applicable here.

We believe that *Bell* is controlling in the instant matter. There is no evidence to indicate that Farrell, whom Farm Bureau hired to represent Jed, represented anyone other than Jed. Earlier in this opinion, we indicated that Farrell filed an affidavit flatly stating that he did not represent Farm Bureau and that he only represented Jed. The record clearly indicates that Paul Hasty, Jr., represented Farm Bureau in this matter and that Farrell represented Jed. There is no merit to the argument that Farrell somehow also represented Farm Bureau or that he had any authority to bind it to the consent judgment.

Finally, while the trial court did not consider whether Farm Bureau rejected the consent judgment in bad faith or negligently, we have done so. We hold that as a matter of law, Farm Bureau's rejection of the consent judgment was not in bad faith but was reasonable and appropriate. There are several reasons why we reach this conclusion.

First, we have discussed the circumstances that led to the settlement. We conclude the first jury verdict, in and of itself, is clear evidence that it was reasonable to reject a settlement offer which would have required a new jury to award plaintiff a judgment over 100 times greater than the verdict actually handed down.

The only issue of liability asserted against Jed was negligent entrustment. In order for Jed to be liable under the theory of negligent entrustment, the law would have to conclude that it is negligent for a nonowner to return control of a vehicle, upon demand,

to its owner. In *Snodgrass v. Baumgart*, 25 Kan. App. 2d 812, 816, 974 P.2d 604 (1999), we held that no action for negligent entrustment can occur where the person entrusting the vehicle lacked a superior or exclusive right of control over the vehicle. We believe that reasoning is controlling in the instant matter. The automobile in this case did, in fact, belong to Tony. He asserted that it was his automobile when he took it back from Jed and when he took it away from his grandmother's home the day of the fatal accident. The vehicle was purchased with Tony's money and put in his father's name for reasons set out above. Jed only came into possession of the vehicle originally because Tony gave him the keys and told him to drive. Jed certainly had no superior or exclusive right of control over the car as compared to Tony's control. Without unduly extending this opinion, we conclude there was no basis on which Jed could be held liable for the tragic accident that took the life of plaintiff's son. It was certainly reasonable for Farm Bureau to reject a $50,000 consent judgment where the basis for Jed's liability was seriously in doubt. We believe Farm Bureau would have been well advised to continue to litigate the issue of whether negligent entrustment was applicable under the facts of this case.

Farm Bureau also contended its coverage was excess to Hawkeye. If that contention is correct, Farm Bureau has no liability. We see no need for an extensive discussion of this issue. We state, however, that in our judgment, the trial court erred in finding that Farm Bureau had the primary coverage. We believe that Farm Bureau's coverage was excess only and that it was reasonable for Farm Bureau to reject the settlement offer and to continue to litigate the question of who had the primary coverage.

In the final analysis, we conclude that if an insurer is to be subjected to a consent judgment in an action to which it is not a party, that judgment ought to be one which is clearly bona fide and in good faith. The judgment in this case is lacking in those features.

For the reasons set forth in this opinion, we reverse the trial court's decision in favor of plaintiff and remand the matter with

directions to enter summary judgment in favor of Farm Bureau. All other issues argued are rendered moot in view of our decision.

Reversed and remanded.